STATE OF CONNECTICUT *v.* EDWIN F. RODRIGUEZ
(AC 27565)

DiPentima, Lavine and West, Js.

Argued February 13—officially released May 13, 2008

*Alice Osedach,* assistant public defender, for the appellant (defendant).

*Michele C. Lukban,* senior assistant state's attorney, with whom, on the brief, were *David I. Cohen,* state's attorney, and *Paul J. Ferencek,* senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Edwin F. Rodriguez, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the second degree in violation of General Statutes § 53a-135 (a) (1) and conspiracy to commit robbery in the second degree in violation of General Statutes §§ 53a-48 (a) and 53a-135 (a) (1). On appeal, the defendant claims that (1) he was denied a fair trial when (a) the court and the prosecutor referred to the complaining witness as the victim and (b) the court limited his cross-examination of the complaining witness, and (2) his conviction of both robbery in the second degree and conspiracy to commit robbery in the second degree violate Wharton's rule.[1] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. William Castaneda, the complaining witness, was employed by an automobile dealer to install accessories in motor vehicles. On Saturday, February 5, 2005, he had spent the day installing a remote starter in the vehicle of a friend, who paid him $150 in cash, including a $100 bill, for his services. At approximately 8:15 p.m. that day, Castaneda parked his own vehicle on Vassar Avenue in Stamford opposite a "strip club" called Harry O's. As Castaneda walked toward Harry O's, a green sport utility vehicle passed him, stopped, backed up and stopped again near him. Castaneda was on the passenger's side of the vehicle. Angel Rosa, who was driving the vehicle, leaned across the defendant, who was in the passenger seat, to talk to Castaneda. Rosa was wearing a do-rag under a baseball style cap. Rosa

[1] Wharton's rule, named for Francis Wharton, is "a doctrine of criminal law enunciating an exception to the general principle that a conspiracy and the substantive offense that is its immediate end are discrete crimes for which separate sanctions may be imposed." *Iannelli* v. *United States*, 420 U.S. 770, 771, 773, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975).

asked Castaneda if he knew him. Castaneda, recognizing Rosa as someone whom he had seen in Stamford in prior years, answered, "yes."

Rosa then asked Castaneda to come to his side of the vehicle. Castaneda walked to the driver's side of the vehicle and noticed a young, light skinned woman, Marisol Alicea, sitting in the backseat. Rosa asked Castaneda if he wanted to purchase some cocaine, and Castaneda said, "no." Castaneda noticed that the defendant had gotten out of the vehicle and walked up behind him. Castaneda turned to face the defendant, who put a gun in Castaneda's stomach and asked for everything in his pockets. Castaneda thought it was a .45 caliber gun. Castaneda, being slight in stature and fearful of being injured, let the defendant take whatever he wanted. The defendant was wearing a black leather jacket and his hair was in "corn rows." The defendant took Castaneda's keys from his front pockets and got back into the vehicle. When Castaneda turned to face the defendant, Rosa took Castaneda's wallet from his back pocket. Castaneda asked Rosa to return his wallet because it contained his operator's license, which Rosa did after removing approximately $150 from the wallet. As the defendant, Rosa and Alicea drove off, Castaneda looked for a license plate on the bumper or rear of the vehicle but did not see one.

Castaneda walked toward a police substation on Fairfield Avenue. Between 8:20 p.m. and 8:30 p.m., Castaneda saw a police vehicle and flagged it down. He told Shawn Redfield, a Stamford police officer, what had happened and described the vehicle and its occupants. Redfield sent a radio bulletin that a robbery had occurred as well as descriptions of the vehicle and its occupants.

Officer Seth O'Brien and Officer Kevin Lynch were in separate patrol vehicles when they heard the broadcast

that a robbery had occurred on Vassar Avenue. Both officers observed a vehicle fitting that description parked at the corner of South Pacific Street and Woodland Avenue. O'Brien saw a Hispanic male in the front passenger seat and a light skinned female in the rear seat. Lynch patted down the defendant but found no drugs or contraband. Officer Stephen J. Parrotta arrived and patted down Alicea and found a black handgun in her waistband. The handle of the gun, which was an air pistol, was wrapped in black tape.

O'Brien entered the store on the street corner to look for the operator of the vehicle. On the basis of the response to his inquiry, O'Brien radioed that a suspect had left the store and was walking toward Henry Street on South Pacific Street. Officer Ben Miller heard the radio broadcast and drove north on South Pacific Street looking for a Hispanic man wearing a black baseball cap over a do- rag, and possibly a black jacket. Officer Karl Franzetti had detained another suspect, and Miller went to assist him. A pedestrian advised Miller to look for a suspect in a multifamily dwelling near the corner of Garden and Henry Streets. Miller entered the building and found a man standing behind a staircase. The man fit the description of the third suspect described by Redfield, lived in Bridgeport and had no reason to be in the building. Miller took the man into custody and patted him down but found no drugs or contraband.

Redfield drove Castaneda to the intersection of Henry and Garden Streets where Miller and Franzetti had detained the two male suspects. Redfield shone his spotlight on each man individually. Castaneda indicated that the suspect detained by Franzetti had not been involved in the robbery but that the suspect detained by Miller had been involved. The man identified by Castaneda was Rosa. Rosa was arrested and taken to the police station.

Redfield then drove Castaneda to the store at South Pacific and Woodland Streets. Again Redfield shone his spotlight on each of the suspects. Castaneda identified the woman as the backseat passenger in the sport utility vehicle and the man, the defendant, as the front seat passenger who had approached him with a gun. Sergeant Michael A. Noto showed Castaneda a gun, which Castaneda identified as the one that had been used during the robbery. The defendant admitted that the gun belonged to him. The defendant and Alicea were arrested.[2]

The defendant was advised of his constitutional rights. Noto searched the defendant and found a set of keys in his pocket. Castaneda identified the keys as his. The police also found $261 in cash in the defendant's possession, consisting of two $100 bills, two $20 bills, one $10 bill, one $5 bill and six $1 bills. The defendant testified that the money in his wallet was a portion of the money ($504) he received when he cashed a federal government check on February 3, 2005. When Noto asked the defendant what had taken place, he stated that he had been driving the sport utility vehicle when he stopped to talk to Castaneda. Rosa got out of the vehicle, pointed a gun at Castaneda and robbed him. The defendant claimed that he did not know that the robbery was going to take place but admitted that he took Castaneda's wallet, removed the cash and returned it.

Subsequent to the arrests, the police conducted an inventory search of the sport utility vehicle, which was registered to Tanya Rodriquez. They found the rear license plate wedged into the rubber molding around the rear window and the front license plate on the floor.

---

[2] The defendant was charged in a bill of particulars with two counts of robbery in the second degree in violation of General Statutes § 53a-135 (a) (1) and (2) and one count of conspiracy to commit robbery in the second degree in violation of General Statutes § 53a-48 (a).

The police found no drugs or drug paraphernalia in the vehicle.

At trial, the defendant testified that on the date in question, he was the front seat passenger in a sport utility vehicle being driven by Rosa. After Alicea got in the car, Rosa wanted to sell cocaine and put one and one-half bags of the narcotic in the armrest between the front seats of the vehicle. Rosa, Alicea and the defendant drove to Vassar Avenue where Rosa called out to Castaneda. The defendant also testified that Castaneda gave Rosa $20 for the cocaine. When Rosa lifted the armrest to get the cocaine, he had to pick up the defendant's gun that was lying on top of the cocaine. The defendant had placed the gun in the armrest because it had broken, and he had intended to repair it. According to the defendant, Castaneda gave Rosa his keys as collateral for more cocaine. Rosa gave the keys to the defendant to hold until they obtained more cocaine.

The jury found the defendant guilty of two of the three charges against him.[3] See footnote 2. The court sentenced the defendant to an effective term of ten years in prison, execution suspended after six years, and five years of probation. This appeal followed.

I

The defendant has asserted a three part claim that he was denied the right to a fair trial under both the state and federal constitutions because Castaneda was referred to as the victim by the court and the prosecutor, and the court denied his motion for a mistrial premised on those references. We disagree that the defendant was denied a fair trial.[4]

---

[3] The jury found the defendant not guilty of robbery in the second degree in violation of General Statutes § 53a-135 (a) (2).

[4] Although the defendant alleged violations of his state and federal constitutional rights, he briefed the issue only under the federal constitution. We therefore consider his state constitutional claim abandoned and do not

The following facts relate to the defendant's claim. Prior to jury selection, defense counsel orally moved that the court not refer to Castaneda as the victim during colloquy or in its instructions to the jury and that the court instruct the prosecutor not to refer to Castaneda as the victim. The defendant's defense was that no robbery had occurred, as his interaction with Castaneda was related to a drug transaction. The defendant argued in support of the motion in limine that referring to Castaneda as the victim would imply that a crime had occurred and that the defendant was guilty. The defendant relied on *State* v. *Cortes*, 84 Conn. App. 70, 851 A.2d 1230 (2004), aff'd, 276 Conn. 241, 885 A.2d 153 (2005),[5] to support his argument. The state countered that although *Cortes* admonishes the court not to refer to a complainant as the victim when the issue at trial is whether a crime has occurred, *Cortes* imposes no such restriction on the prosecutor. Referring to Castaneda as the victim, the state asserted, is consistent with the role of a prosecutor seeking justice for the citizens of the state. The court indicated that it would refrain from referring to Castaneda as the victim but would not prohibit the prosecutor from referring to Castaneda as the victim.

A

The defendant claims that the court denied him the right to a fair trial by violating its own order not to refer to Castaneda as the victim. Although the court referred to Castaneda as the victim in one portion of its instruction, viewing the court's charge as a whole

address it. See, e.g., *State* v. *Nieves*, 106 Conn. App. 40, 44 n.5, 941 A.2d 358, cert. denied, 286 Conn. 922, 949 A.2d 482 (2008).

[5] At the time of trial, our Supreme Court had not yet rendered its decision in *Cortes*. When ruling on the defendant's motion, the trial court noted that this court's decision in *Cortes* was on appeal. Our Supreme Court affirmed the decision of this court on an unrelated question concerning the admission of certain evidence. *State* v. *Cortes*, 276 Conn. 241, 885 A.2d 153 (2005).

and its curative instruction, we disagree that the court denied the defendant a fair trial on the basis of its charge.

The court's entire instruction is approximately thirty pages long. Our review of it discloses that the court used the word victim five times when defining physical force. Immediately after the court defined larceny and intent, it stated: *"If you find beyond a reasonable doubt that the defendant was committing a larceny,* then you must next determine whether the larceny was accomplished by physical force. Physical force means the external physical power over the person, which can be effected by hand or foot or another part of the defendant's body applied to the victim's body or applied by an implement, projective or weapon. The gist of robbery, then, is the commission of a larceny, a use of physical force or threat of immediate physical force. Physical force may take many forms. If you find that no actual physical force was inflicted upon the person of the victim, but the victim was threatened with physical force . . . you must also find, to return a verdict of guilty, that the defendant threatened the victim with the immediate use of physical force.

"Now, if you find that the physical force was used or its use immediately threatened against a person in the course of committing a larceny, you must next determine whether such physical force was used or threatened for the purpose of preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after taking or compelling the owner of the property to deliver up the property or to engage in other conduct that aids in the commission of a larceny." (Emphasis added.)

At the conclusion of the court's charge, which occurred at the end of the day, the prosecutor noted that the court used the word victim when defining the

elements of robbery in the second degree and the use of physical force. Defense counsel stated that the court's referring to Castaneda as the victim contravened the court's own order not to refer to Castaneda as the victim and requested that the court reinstruct the jury. The court agreed to reinstruct the jury the next day.

The next day the defendant filed a motion for a mistrial on the basis of Castaneda's having been referred to as the victim by both the court and the prosecutor. Counsel also presented the court with a request to charge. The court denied the defendant's motion for a mistrial and told counsel that it would recharge the jury. In doing so, the court noted that this court's decision in *Cortes* was based, in part, on the failure of the trial court in that case to reinstruct the jury. In addition, the court noted that not only did it inadvertently refer to Castaneda as the victim, but it recalled that defense counsel did so as well in her final argument.[6] Thereafter, the court reinstructed the jury, stating: "William Castaneda, who testified on two separate occasions in this case, is the complainant in this matter. It is for you, the jury, to determine whether any crimes have been committed against Mr. Castaneda and whether the defendant has committed any of the crimes. I remind you, as I previously instructed you, that the presumption of innocence remains with the defendant throughout the trial, unless and until the state proves beyond a reasonable doubt the essential elements of the crimes charged. That is why Mr. Castaneda is referred to as the complainant. And you are to disregard any other references that I may have made to him in the charge."[7]

---

[6] The court's recollection was accurate. Defense counsel argued, in part, that "the victim's not on trial."

[7] The defendant took an exception to the court's curative instruction because the court did not explicitly state that its earlier reference to Castaneda as the victim was not an endorsement of Castaneda's credibility and that the court did not believe that Castaneda was a victim.

On appeal, the defendant claims that the court's referring to Castaneda as the victim in its charge denied him due process of law. "The principles guiding a trial judge in conducting a criminal trial are well established. Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted.) *State* v. *Lopes*, 78 Conn. App. 264, 274, 826 A.2d 1238, cert. denied, 266 Conn. 902, 832 A.2d 66 (2003).

The state has argued that the court's use of the word victim was inadvertent, as was defense counsel's, and was limited to the instruction on physical force. The state claims that when the challenged language is viewed within the context of the court's entire charge, it is not reasonably possible that the jury was misled. See *State* v. *Robinson*, 81 Conn. App. 26, 30–31, 838 A.2d 243, cert. denied, 268 Conn. 921, 846 A.2d 882 (2004). The state concedes that under certain circumstances, the court is not to refer to the complaining witness as the victim but that in this case, any potentially prejudicial effect of the court's use of the word was ameliorated by the court's curative instruction on the presumption of innocence, and the jury's duty to determine the guilt or innocence of the defendant and to determine the credibility of the witnesses. See id., 32. On the basis of our review of the court's entire charge, we conclude that the instruction was not improper. By virtue of the logical sequence of the instruction, the jury was not to consider the issue of physical force unless it found that the defendant had committed the crime of larceny.

"In determining whether a trial court's charge satisfies constitutional requirements . . . individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . .

"The trial court should never assume a position of advocacy, real or apparent, in a case before it, and should avoid any displays of hostility or skepticism toward the defendant's case, or of any approbation for the prosecution's. . . . In commenting on, or marshaling, evidence during its charge, the court is under a duty to provide a fair summary of the evidence and to demonstrate strict impartiality." (Citations omitted; internal quotation marks omitted.) *State* v. *Cortes*, supra, 84 Conn. App. 85–86.

The defense at trial in *State* v. *Cortes*, supra, 84 Conn. App. 70, was that the alleged crimes did not happen. On appeal, the defendant claimed that the court "violated his due process right to a fair trial during its jury charge by referring to the complainant as 'the victim' . . . ." Id., 71–72. This court agreed, reasoning that "[i]n cases in which the fact that a crime has been committed against the complaining witness is not contested, but only the identity of the perpetrator is in dispute, a court's use of the term 'victim' is not inappropriate. In cases in which the fact that a crime has been committed

is contested, and where the court's use of the term 'victim' has been the subject of an objection and has not been the subject of a subsequent curative instruction, a court's use of the term may constitute reversible error. The danger in the latter type of case is that the court, having used the term without specifically instructing the jury as to its intention in using the term, might convey to the jury, to whatever slight degree, its belief that a crime has been committed against the complainant." Id., 86.[8]

Our analysis of the defendant's claim that the court's referring to Castaneda as the victim denied him due process of law is in two parts. First, we must determine whether the court's instruction was improper and then, if the instruction was improper, whether the court's curative instruction was adequate to protect the defendant's constitutional rights. As to the first part, we conclude that by referring to Castaneda as the victim in its instruction on physical force, the court did not violate the dictates of *Cortes* or the defendant's constitutional rights.

---

[8] Our Supreme Court granted the state's petition for certification to appeal on two grounds. Only the first question is related to the issues in this appeal. "1. Did the Appellate Court properly conclude that the trial court's instructional references to the complainant as 'the victim' deprived the defendant of his right to a fair trial?" *State* v. *Cortes*, 271 Conn. 917, 859 A.2d 571 (2004). Our Supreme Court affirmed this court's judgment on the basis of the second certified question that was of an evidentiary nature and stated that it "need not address the first certified question . . . ." *State* v. *Cortes*, 276 Conn. 241, 249, 885 A.2d 153 (2005). Nevertheless, our Supreme Court included the following footnote in its opinion.

"The trial court's seventy-six references to the complainant as the 'victim' were neither isolated nor sporadic, but pervasive. The term 'victim' commonly is understood to mean the person harmed by a crime or other injurious event. See American Heritage College Dictionary (4th Ed. 2002) (defining victim as '[o]ne who is harmed or killed by another'). In the context of the present case, the jury could have drawn only one inference from its repeated use, namely, that the defendant had committed a crime against the complainant. For this reason, we agree with those courts that have deemed references to the complainant as the 'victim' inappropriate where the very commission of a crime is at issue." *State* v. *Cortes*, supra, 276 Conn. 249 n.4. The defendant

The court began its charge by explaining the functions of the court and of the jury, specifically emphasizing that the jury was the sole judge of the facts and that the court's actions were not to be taken as an indication of the court's opinion as to how the jury should determine the issues of fact. Specifically, the court stated that if it "has expressed or intimated any opinion as to the facts, [the jury is] not bound by that opinion." The court charged the jury on the presumption of innocence and that the defendant was innocent until the evidence produced convinced the jury beyond a reasonable doubt of his guilt. The court proceeded to the state's burden of proof and reasonable doubt. The court also instructed the jury that the questions, objections and arguments of counsel are not evidence and that it was to decide the case on the evidence presented and distinguished direct from circumstantial evidence. The court also told the jury how to make credibility determinations and how to weigh the testimony of police officers, expert witnesses and the defendant, who took the witness stand in his defense. The court next instructed the jury on intent and then the specific crimes with which the defendant was charged. With regard to the charges of robbery in the second degree, the court stated that "[y]ou must first consider whether the defendant committed a robbery." It then instructed the jury on the crime of larceny. Thereafter the court stated to the jury that "[i]f *you find beyond a reasonable doubt that the defendant was committing a larceny*, then you must next determine whether the larceny was accomplished by physical force." (Emphasis added.) During its instruction on physical force, the court used the word victim five times, which is the basis of the defendant's claim on appeal.

The defendant's defense was that the crimes with which he was charged did not occur. The defendant

---

in *Cortes* had been convicted of one count of unlawful restraint in the first degree and one count of assault in the second degree. Id., 242.

admitted to being present for a drug transaction between Castaneda and Rosa. The trial, therefore, was not about who committed an obvious crime but whether a crime had occurred at all. The sequence of the court's instruction was to help the jury determine whether Castaneda had been robbed. To reach that determination, the jury first had to determine whether a larceny had occurred and then whether the accused had the intent to commit the larceny. Only *after* the jury had found that the defendant intended to commit the crime of larceny and that a larceny had occurred was it to consider the element of physical force. Pursuant to the court's instruction, by the time the jury was to consider the physical force element of the crime of robbery, the jury must have found that a crime had occurred. The jury found that the defendant's interaction with Castaneda was not a drug transaction but a larceny. The focus of the jury's deliberation, therefore, moved from whether a crime had occurred to who had perpetrated it. The court's use of the word victim in the context of physical force, therefore, was not improper.

The jury instruction in this case is further distinguished from that in *Cortes*, in which the court used the word victim seventy-six times while instructing the jury and did not give a curative instruction. The court here used the word five times within a specific instruction on an element of the crime of robbery, physical force, which the jury could consider only if it found that a larceny had been committed. Unlike in *Cortes*, therefore, the court's use of the term was isolated, not pervasive. Moreover, even if the use of the word victim in the context of the court's charge had been improper, which it was not, the court's instruction given the next day before the jury retired for its deliberations was curative.[9] This court has determined that the presumption of innocence charge ameliorates whatever impermissible effect, if any, was caused by the court's

---

[9] The court again instructed the jury on the presumption of innocence, that the jury was to determine whether a crime had been committed against

referring to Castaneda as the victim. See *State* v. *Eric M.*, 79 Conn. App. 91, 99–100, 829 A.2d 439 (2003), aff'd, 271 Conn. 641, 858 A.2d 767 (2004). "[I]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Lemay*, 105 Conn. App. 486, 493, 938 A.2d 611 (2008).[10] We conclude, on the basis of our review of the court's whole instruction, that the court's use of the word victim did not deprive the defendant of a fair trial.

B

The defendant also claims that the prosecutor's repeated reference to Castaneda as the victim constituted prosecutorial impropriety that denied him the right to due process of law. We are not persuaded.

As previously set forth, the court agreed not to refer to Castaneda as the victim but refused to order the prosecutor to refrain from referring to Castaneda as the victim. After the court had instructed the jury, the defendant filed a motion for a mistrial, claiming that he was denied due process of law, in part, due to the prosecutor's repeated use of the word victim during his examination of the state's witnesses and during final argument. The defendant's claim is that the prosecutor's repeated use of the word victim denied him the presumption of innocence because the prosecutor's words

---

Castaneda, who was the complainant, and that the jury was to ignore any other reference to Castaneda. Twice the court instructed the jury on the presumption of innocence: once in its initial charge and again in its curative instruction.

[10] We also note that during argument on the defendant's motion for a mistrial, the defendant acceded to the court's giving a curative instruction if the motion for a mistrial was denied. Defense counsel asked the court to grant the motion for a mistrial but also stated that "[i]n lieu of a mistrial, [if] the court did not grant it, I understand the court has a proposed instruction, and we certainly would accede to that proposed instruction, although our obvious desire is for a mistrial based on the egregious harm."

were an expression of his personal opinion as to the defendant's credibility.

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether the [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Ancona*, 270 Conn. 568, 595, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005).

Our Supreme Court has stated that a court's repeated use of the word victim with reference to the complaining witness is inappropriate when the issue at trial is whether a crime has been committed. *State* v. *Warholic*, 278 Conn. 354, 369, 897 A.2d 569 (2006). A different set of circumstances exists when the person making reference to the complaining witness is the prosecutor. Id., 369–70. Under those circumstances, our Supreme Court has concluded that "the jury was likely to understand that the state's identification of the complainant as the victim reflected the state's contention that, based on the state's evidence, the complainant was the victim of the alleged crimes." Id., 370; cf. *State* v. *Smith*, 51 Conn. App. 589, 592, 724 A.2d 527 (1999) (jury could determine that prosecutor's use of word victim meant alleged victim).

In this case, the prosecutor used the word victim sporadically when questioning two of the state's seven witnesses, Redfield and Noto. In his reply brief, the defendant concedes that the prosecutor's use of the word victim when examining the state's witnesses was

not frequent. There is, however, no mathematical formula that can be applied ritualistically to claims such as the defendant's. In his closing argument, the prosecutor referred to Castaneda as the victim. Before the prosecutor got into the heart of his argument, he stated to the jury that what he was about to say was argument, not evidence. He also stated that argument is how counsel interprets the evidence.[11] The prosecutor further advised the jury that he was not permitted to comment on the credibility of the witnesses and that the jury is the finder of facts. The first time the prosecutor used the word victim, he did so in the context of whether the victim was believable. He stated: "Now, in this case, as you know by now, the gun that was used in this incident, if you believe the victim, William Castaneda, was obviously a BB gun; it was an air gun." The prosecutor then stated that there were two sides to the story, and then recounted his recollection of the "victim's" testimony. The prosecutor argued that the police work and evidence substantiated the "victim's" testimony.

"[A]s the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper." (Internal quotation marks omitted.) *State* v. *Nelson*, 105 Conn. App. 393, 415, 937 A.2d 1249, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008). "It is well settled that, in addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of the argument. . . . Moreover, [i]t does not follow . . . that every use of

---

[11] The court instructed the jury that the arguments of counsel reflected their view of the evidence.

rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 362–63. In this case, defense counsel did not object to the prosecutor's argument when it was given. The issue came up the following day in the context of the defendant's motion for a mistrial.

Although there are limits to the use of rhetorical devices to which a prosecutor may resort, this is not a case in which the jury likely was moved by sympathy toward Castaneda. Cf. *State* v. *Cortes*, 276 Conn. 241, 885 A.2d 153 (2005) (young woman complainant allegedly assaulted and kidnapped by defendant). Here, there was an evidentiary basis for the jury to conclude that Castaneda was the victim of a robbery and therefore such evidence was proper grist for the prosecutor's final argument. See *State* v. *Warholic*, supra, 278 Conn. 367. Jurors understand the respective roles of the prosecutor and defense counsel. It should not be assumed that jurors will be unduly influenced by the prosecutor's use of the word victim. We therefore conclude, under the facts of this case, that the prosecutor's reference to Castaneda as the victim was appropriate, not the expression of a personal opinion, and did not constitute prosecutorial impropriety that denied the defendant a fair trial.

C

The defendant's third claim with respect to the court's and prosecutor's referring to Castaneda as the victim concerns the court's denial of the motion for a mistrial. We review claims of a court's ruling on a motion for a mistrial under the abuse of discretion standard. *State* v. *Hamlett*, 105 Conn. App. 862, 872, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008). "While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be

granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome." (Internal quotation marks omitted.) Id.

After the court instructed the jury, the defendant filed a motion for a mistrial in which he claimed that he had been denied a fair trial by the use of the word victim by both the court and the prosecutor with respect to Castaneda. The court denied the motion for a mistrial, noting that any prejudice may be ameliorated by a curative instruction. The court intended to give the jury a curative instruction and, in fact, did so. Defense counsel acceded to the court's providing a curative instruction to the jury. See footnote 10.

For the reasons set forth in parts I A and B, we conclude that the court did not abuse its discretion by denying the defendant's motion for a mistrial. The jury's verdict itself belies any claim that the references by the court or the prosecutor to Castaneda as the victim deprived the defendant of a fair trial. In addition to the conspiracy count, the defendant was charged with two counts of robbery in the second degree. The jury found the defendant not guilty of one of the counts of robbery in the second degree. See footnote 3. That fact leads us to believe that the jury carefully weighed the evidence and applied the law as it was instructed. We conclude that the defendant was not denied the right to a fair trial by the court or the prosecutor when they referred to Castaneda as the victim.

## II

The defendant also claims that the court improperly failed to apply Wharton's rule to his conviction of conspiracy to commit robbery in the second degree and robbery in the second degree.[12] The defendant argues that because robbery in the second degree requires the participation of two people for its commission, as does his conviction of conspiracy to commit robbery in the second degree, Wharton's rule applies.[13] We do not agree with the defendant's claim.

The United States Supreme Court addressed the history and application of Wharton's rule in *Iannelli* v. *United States*, 420 U.S. 770, 771, 773, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975). Our own Supreme Court relied heavily on *Iannelli* in *State* v. *Acklin*, 171 Conn. 105, 368 A.2d 212 (1976). Those cases guide our decision. The defendant's claim raises a question of law and, thus, we apply the plenary standard of review. See, e.g., *State* v. *Long*, 268 Conn. 508, 520–21, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

---

[12] The defendant raised the applicability of Wharton's rule at sentencing. Following the argument of counsel, the court declined to apply Wharton's rule in this case.

[13] General Statutes § 53a-135 (a) provides in relevant part: "A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and (1) he is aided by another person actually present . . . ."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

"As a general rule, the double jeopardy clause does not bar prosecution of a defendant for both conspiracy to commit a substantive offense and the substantive offense itself, and, in most cases, separate sentences can constitutionally be imposed upon conviction." *State v. Acklin,* supra, 171 Conn. 116. "Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes. Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act. . . . Unlike some crimes that arise in a single transaction . . . the conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act. . . .

"The consistent rationale . . . rests on the very nature of the crime of conspiracy. This [c]ourt repeatedly has recognized that a conspiracy poses distinct dangers quite apart from those of the substantive offense. . . . The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish." (Citations omitted; internal quotation marks omitted.) *Iannelli* v. *United States,* supra, 420 U.S. 777–79. "[A]greement remains the essential element of the crime [of conspiracy], and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact . . . and from other substantive offenses as well." (Citation omitted.) Id., 777 n.10.

"Wharton's Rule does not rest on principles of double jeopardy . . . . Instead, it has current vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary." (Citations omitted.) Id., 782. "In its most recent formulation, Wharton's rule reads as follows: 'An agreement by two persons to commit a crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require

the participation of two persons for its commission.' 1 Wharton, Criminal Law & Procedure (Anderson Ed.) § 89, p. 191." *State* v. *Acklin,* supra, 171 Conn. 117.

"The classic Wharton's Rule offenses—adultery, incest, bigamy, duelling—are crimes that are characterized by the general congruence of the agreement and the completed substantive offense. The parties to the agreement are the only persons who participate in commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on *society at large. . . .* Finally, the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society that the law of conspiracy seeks to avert. It cannot, for example, readily be assumed that an agreement to commit an offense of this nature will produce agreements to engage in a more general pattern of criminal conduct." (Citation omitted; emphasis added.) *Iannelli* v. *United States,* supra, 420 U.S. 782–84.[14]

The substance of the defendant's claim on appeal is that because two participants were necessary for a

[14] Section 12.4 (c) (4) of 2 W. LaFave, Substantive Criminal Law (2d Ed. 2003), provides pertinent examples of the Wharton's rule applicability. "[T]he prevailing view is that the Wharton rule does not apply when the number of conspirators exceeds the essential participants in the contemplated crime. Thus, while it is not a conspiracy for *A* and *B* to agree to the commission of adultery involving only themselves, if *C* conspires with *A* and *B* for the commission of adultery by the latter two then all three are guilty of conspiracy. So too, there is no conspiracy if *D* agrees with *F* to give *F* a bribe, but it is otherwise if *D* and *E* agreed to bribe *F*.

"A somewhat different limitation on the Wharton rule is this: if the law defining the substantive offense does not specify any punishment for one of the necessary participants, then it is no bar to a conspiracy conviction that only the essential participants were involved. . . . For example, if *A* agrees with *B* to give him an illegal rebate, but the applicable statute imposes a penalty only on the giver of the rebate, then *A* and *B* may be convicted of conspiracy. Or, if *C* agrees to make an illegal sale of liquor to *D*, but the statute penalizes only the seller, *C* and *D* are guilty of conspiracy." (Emphasis in original.) Id., § 12.4 (c) (4), pp. 319–20.

conviction of robbery in the second degree, he could not also be convicted of conspiracy. In other words, he argues, the substantive crime flowed from the agreement of the two participants. The defendant's claim misconstrues Wharton's rule. The state charged the defendant with conspiracy to commit robbery with one or more persons. The evidence demonstrated that Rosa and Alicia, in addition to the defendant, participated. Rosa may have pointed a gun at Castaneda, but the gun was found later on Alicia's person. "[A] well-recognized exception to Wharton's rule renders it inapplicable where more parties participate in the conspiracy than are required for the commission of the substantive offense." *State* v. *Acklin*, supra, 171 Conn. 118. Two people were necessary to commit robbery in the second degree in violation of § 53a-135 (a) (1), but three people participated in the conspiracy. In addition, the rationale underlying Wharton's rule does not apply to crimes against society at large. In this case, Castaneda was not a member of the conspiracy, and the robbery was constituted as an offense not only against him, but also against society at large. For these reasons, the defendant's claim as to Wharton's rule fails.

### III

The defendant's third claim is that the court denied him the right to confront witnesses against him and to present a defense by not permitting him to question Castaneda as to whether he used drugs at any time other than on or near the night in question. The issue presented by the defendant is an evidentiary question, not a constitutional one. We conclude that the court did not abuse its discretion by limiting the defendant's inquiry into Castaneda's drug use.

The following facts are relevant to the defendant's claim. Prior to trial, the state filed a motion to preclude

the defendant from eliciting uncharged misconduct evidence from Castaneda that was not relevant to his veracity. At the time of trial, Castaneda was twenty-two years old. The defendant sought to question Castaneda about his drug use at or about the time of the incident and when he was in high school and was acquainted with Rosa. The theory of defense was that no robbery had occurred, but an incomplete drug transaction had taken place. The defendant sought to use Castaneda's alleged prior drug usage to prove that Castaneda purchased drugs from Rosa on the night in question. The court ruled that Castaneda's use of drugs on or about February 5, 2005, was relevant and admissible but precluded the defendant from eliciting evidence about Castaneda's alleged prior use of drugs as such evidence was too remote.[15]

"The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Morrissette*, 105 Conn. App. 743, 747, 939 A.2d 621, cert. denied, 286 Conn. 918, 945 A.2d 978 (2008). "If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence [is] properly excluded." (Internal quotation marks omitted.) *State* v. *DeJesus*, 270 Conn. 826, 838, 856 A.2d 345 (2004). The party proffering the evidence bears the burden of establishing its relevance. *State* v. *Gerald W.*, 103 Conn. App. 784,

---

[15] Castaneda was asked by both the defendant and the state if he used drugs at about the time of the robbery. He denied using drugs at that time. Furthermore, although he previously had known Rosa, Castaneda and Rosa did not go to high school together.

794 n.7, 931 A.2d 383, cert. denied, 284 Conn. 933, 935 A.2d 152 (2007).

"When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes." (Internal quotation marks omitted.) *State* v. *McSwain*, 105 Conn. App. 258, 271–72, 938 A.2d 595, cert. denied, 286 Conn. 915, 945 A.2d 978 (2008).

"Determining whether evidence is relevant and material to critical issues in a case is an inherently fact-bound inquiry. . . . As a general principle, evidence is relevant if it has a tendency to establish the existence of a material fact. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable." (Citations omitted; internal quotation marks omitted.) *State* v. *DeJesus*, supra, 270 Conn. 837–38. "Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . [T]he trial court's ruling on the relevancy of . . . evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Morrissette*, supra, 105 Conn. App. 748.

We agree with the court that whether Castaneda used drugs when he was in high school was not relevant to whether Castaneda purchased drugs from Rosa on the

night in question. When asked, Castaneda denied using drugs. It was for the jury to decide if Castaneda was telling the truth. We conclude that the court did not abuse its discretion or deny the defendant a constitutional right.

The judgment is affirmed.

In this opinion the other judges concurred.