STATE OF CONNECTICUT *v.* ARTHUR
GLEN KURRUS
(AC 32772)
(AC 32773)

Robinson, Espinosa and Bishop, Js.

Argued May 24—officially released August 21, 2012

*Richard Emanuel*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *David Shepack*, state's attorney, and *Devin T. Stilson*, supervisory assistant state's attorney, for the appellee (state).

ROBINSON, J. The defendant, Arthur Glen Kurrus, appeals from the judgments of conviction rendered after a jury trial of two counts of larceny in the first degree in violation of General Statutes §§ 53a-119 and 53a-122 (a) (3) and one count of forgery in the second degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-139. He claims on appeal that (1) the court erred in refusing his request to charge on the theory of defense of mistake of fact as to all counts, (2) there was insufficient evidence to support a conviction on one of the larceny counts and (3) the prosecutor engaged in impropriety during closing arguments. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. In 2003, Steven Cohen owned a 1967 Austin Healey (1967 Healey) that he decided to sell. He contacted the defendant, and they orally agreed that the defendant would sell the vehicle and set the price, but they did not create a written contract or agreement. The next day, the defendant sent a truck to retrieve the vehicle.

From 2003 until 2007, Cohen maintained infrequent contact with the defendant by telephone and e-mail. Beginning in April, 2007, Cohen began e-mailing the defendant more frequently for updates on the sale of the 1967 Healey. In July, 2007, after learning that the defendant had moved his business to California, Cohen contacted the defendant by e-mail to determine where the 1967 Healey was located. In August, 2007, Cohen received a faxed letter from the defendant promising to pay $25,000 for the sale of the vehicle. At some point after receiving the faxed letter from the defendant, Cohen contacted the police to report that the 1967 Healey had been stolen. In September, 2008, Cohen

received a check in the amount of $25,000 from the defendant's attorney.

In April, 2005, Michael Torsone purchased a 1967 Jaguar XKE (1967 Jaguar) and registered the vehicle in New York. Later in 2005, Torsone decided to have Donovan Motorcar Services (Donovan) perform restoration work on the vehicle. In June, 2006, Torsone retrieved the car from Donovan prior to the completion of brake and front end work. After unsuccessfully trying to complete the brake work himself, Torsone contacted the defendant. The defendant told him to bring the car to his business, Paradise Garage, in Lime Rock, Connecticut. After dropping off the 1967 Jaguar, Torsone had conversations with the defendant during which Torsone detailed what work he wanted completed as well as whether he wanted to sell the car.

Torsone did not have a written contract with the defendant but had an oral agreement that allowed the defendant to keep the 1967 Jaguar in his showroom and to talk to people about whether they would want to purchase the vehicle. The defendant set up several auctions for the 1967 Jaguar in October, 2006, as well as in March, April and May, 2007.

By May, 2007, the defendant had engaged in what he characterized as a "cash and trade" deal that involved four vehicles: Cohen's 1967 Healey, Torsone's 1967 Jaguar, a 1960 Austin Healey (1960 Healey) owned by a third party and a 1972 Porsche 911 owned by the defendant. The defendant traded Cohen's 1967 Healey for the 1960 Healey, sold the Porsche for $25,000 and sold Torsone's 1967 Jaguar for $68,500 to a couple in New Hampshire, Melvin Flowers and Shirley Flowers. In order to effectuate the sale of the 1967 Jaguar, the defendant instructed an acquaintance, Frank Saffioti, to sign the New York state registration for the 1967 Jaguar over to Paradise Garage and to sign Torsone's

name. Torsone spoke to the defendant about the sale of the 1967 Jaguar on June 17, 2007, and contacted the state police to report that his car had been stolen.

In the amended information, the defendant was charged with larceny in the first degree of the 1967 Jaguar in count one, forgery in the second degree as an accessory of the registration document to the 1967 Jaguar in count two and larceny in the first degree of the 1967 Healey in count three. The jury found him guilty on all counts. The court sentenced him to ten years imprisonment, execution suspended after three years, and five years probation with conditions. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly refused his request to instruct the jury concerning the defense of mistake of fact on all three counts.[1] The defendant claims that the failure to include the defendant's charge of mistake of fact, based on General Statutes § 53a-6,[2] violated his constitutional rights to present a defense and to a fair trial, as set forth in the fifth, sixth and fourteenth amendments to the United

[1] The defendant filed a supplemental request to charge prior to the charging conference. The request to charge on mistake of fact, as to counts one and three, was as follows: "If someone took property honestly, although mistakenly believing that he had a right to do so, you cannot find that he had the required intent to prove this element of [l]arceny. Also if someone took property and believed that he had permission to take the property, the wrongful intention of depriving a person of property cannot be proven."

As to count two, the request to charge included the following language: "If the defendant believed that he had the authority of . . . Torsone to authorize the execution of the document—even though he was mistaken on that belief, you cannot find that [the] defendant had the required intent to commit the crime of [f]orgery."

[2] General Statutes § 53a-6 provides in relevant part: "(a) A person shall not be relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief of fact, unless: (1) Such factual mistake negates the mental state required for the commission of an offense . . . ."

States constitution and article first, §§ 8 and 9, of the constitution of Connecticut, as there was an evidentiary foundation for the requested instruction as to each count. The state disputes that there was evidentiary support for the requested instruction. We agree with the state.

"We begin with the well established standard of review governing the defendant's challenge to the trial court's jury instruction. Our review of the defendant's claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 454–55, 10 A.3d 942 (2011).

"When considering a claim of failure to deliver a requested charge . . . [t]he court . . . has a duty not to submit to the jury, in its charge, any issue upon which the evidence would not reasonably support a finding." (Internal quotation marks omitted.) *State* v. *Woods*, 250 Conn. 807, 818, 740 A.2d 371 (1999). "An error in instructions in a criminal case is reversible error when it is shown that it is reasonably possible for errors of constitutional dimension or reasonably probable for nonconstitutional errors that the jury [was] misled." *State* v. *Mason*, 186 Conn. 574, 585–86, 442 A.2d 1335 (1982).

"When a defendant admits the commission of the crime charged but seeks to excuse or justify its commission so that legal responsibility for the act is avoided,

a theory of defense charge is appropriate." *State* v. *Rosado*, 178 Conn. 704, 707, 425 A.2d 108 (1979). "[A] defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . ." (Internal quotation marks omitted.) *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986). Mistake of fact is a legally permissible defense that has been codified in § 53a-6. See *State* v. *Rouleau*, 204 Conn. 240, 250 n.12, 528 A.2d 343 (1987). Accordingly, "[a]n instruction on mistake of fact is required only when evidence supporting [this] . . . defense is placed before a jury." (Internal quotation marks omitted.) *State* v. *Beltran*, 246 Conn. 268, 274, 717 A.2d 168 (1998). Moreover, the court "must adopt the version of the facts most favorable to the defendant which the evidence would reasonably support." (Internal quotation marks omitted.) *State* v. *Fuller*, supra, 275.

"No area of the substantive criminal law has traditionally been surrounded by more confusion than that of ignorance or mistake of fact . . . ." 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 5.6 (a), p. 394. "In actuality, the basic rule is extremely simple: ignorance or mistake of fact . . . is a defense when it negatives the existence of a mental state essential to the crime charged. . . . Instead of speaking of ignorance or mistake of fact . . . as a defense, it would be just as easy to note simply that the defendant cannot be convicted when it is shown that he does not have the mental state required by law for commission of that particular offense." Id., p. 395.

Our Supreme Court has stated that "[a] mistake of fact results when one makes an erroneous perception of the facts as they actually exist. . . . The defense arises only where the defendant misperceives an objective state of existing fact, and does not apply to the defendant's erroneous suppositions as to the unformed

intentions of another. A fact is that which has taken place, not something that might or might not take place in the future." (Citation omitted; internal quotation marks omitted.) *State* v. *Silveira*, 198 Conn. 454, 460–61, 503 A.2d 599 (1986). Stated in other words, a mistake of fact "is a misapprehension of a fact which, if true, would have justified the act or omission which is the subject of a criminal prosecution." 21 Am. Jur. 2d 262, Criminal Law § 153 (2008).

A

We first consider the defendant's claim that the court erred in not including in its instructions to the jury a mistake of fact charge as to the larceny counts. We disagree.

In the present case, the state argued that neither Torsone nor Cohen authorized the defendant to execute a cash and trade deal with their vehicles. On the other hand, the defendant's position was that he had express authority to proceed with the cash and trade deal. The defendant testified that he received authorization from Cohen to trade his 1967 Healey in exchange for the 1960 Healey that was owned by a third party after telling Cohen that the 1960 Healey would be easier to sell and that Cohen would receive $25,000. The defendant further testified that he first broached the subject of a cash and trade deal with Torsone after several conversations about how the 1967 Jaguar was not reaching a high enough price on the eBay auctions. According to the defendant, Torsone accepted a proposal whereby the defendant would give Torsone $20,000 and the 1960 Healey to sell to Torsone's friend for $45,000. Subsequently, the defendant testified, he traded the 1967 Healey for the 1960 Healey on the basis of Torsone's representations that he had a buyer for the 1960 Healey and he sold the 1967 Jaguar.

The defendant's request to charge was based on the assertions of his attorney that the defendant misperceived his authority to engage in the cash and trade deal when in fact he did not have such authority. In order to support the defense of mistake of fact, the evidence would have had to show that the defendant did not have authorization to conduct the cash and trade deal and that there was some ambiguity in the words and actions of Cohen and Torsone that led the defendant to believe that he had authorization. His contention that he had express authorization from Cohen and Torsone, however, prevents an assertion of mistake of fact. The defendant did not testify that he misperceived Cohen's and Torsone's refusals to give authority, but rather that they did in fact give such authority. Simply stating that he had express authority and arguing that he was mistaken is not enough to bring the defendant's claim under the ambit of mistake of fact. Although fashioned in terms of mistake of fact, the defendant's claim is in reality nothing more than a denial of the intent to wrongfully withhold the 1967 Healey and 1967 Jaguar. See *State* v. *Silveira*, supra, 198 Conn. 462. This, however, is not a legally recognized defense under our law. See *State* v. *Rosada*, supra, 178 Conn. 707 ("[a] claim of innocence or a denial of participation in the crime charged is not a legally recognized defense and does not entitle a defendant to a theory of defense charge").

Moreover, even if he could argue that he misunderstood Cohen's and Torsone's express authorizations, the defendant presented no evidence that there was a mistake of fact as to his authority to conduct the cash and trade deal. The defendant did not testify or present any evidence that Cohen's or Torsone's authorizations were ambiguous such that he misperceived his authority to engage in the cash and trade deal. Nor was there any evidence that the defendant found his perception of

his authority to be incorrect. "[T]here was no evidence tending to show a factual mistake on the part of the defendant's comprehension of the circumstances to be tested by the jury." *State* v. *Beltran*, supra, 246 Conn. 274. Thus, the defendant was not entitled to an instruction on mistake of fact on the larceny counts.

### B

The defendant also claims that the court improperly failed to instruct the jury on mistake of fact as to the forgery as an accessory count. We disagree.

The defendant testified that he believed that he had authority from Torsone to sign his name on the registration on the basis of the defendant's understanding of how the sale of the 1967 Jaguar and trade of the other vehicles was going to proceed. Again, however, the defendant's position is merely a denial of intent. His position at trial was that he had authority to act, not that he misperceived Torsone's words or actions as authorization to complete the cash and trade deal and to sign the registration.

Additionally, the defendant presented no facts to the jury that revealed how he came to his understanding. There was no testimony or evidence to support the conclusion that the defendant misperceived an objective state of existing fact. See *State* v. *Silveira*, supra, 198 Conn. 460. Rather, the defendant's testimony belied "erroneous suppositions as to the unformed intentions of another." Id., 460–61. Thus, an instruction on mistake of fact with respect to the forgery as an accessory count was unwarranted, and the court did not err in refusing to give such a charge.

### II

The defendant's second claim of error is that there was insufficient evidence to sustain a conviction on the larceny of the 1967 Healey. We disagree.

The jury could have found the following additional facts. In May, 2003, Cohen composed a letter to the defendant regarding documentation about the 1967 Healey. In the letter, Cohen noted that he recognized that the market value of the car might not correlate to the amount of money that he had expended on it for restoration and that he would rely on the defendant to price the car appropriately.

On April 14, 2007, Cohen contacted the defendant by e-mail stating: "I hope we have the opportunity to sell my [1967] Healey this spring as I am very anxious to move the car. I appreciate your patience in trying to get a good price. At this point I recognize that I will have to take a hit, but I would really like to finally sell it." The defendant responded on April 16, 2007, stating: "I'm confident in closing the deal we spoke of in our last conversation." He also declared that he was planning the deal to take place in April and would keep in touch with Cohen.

Cohen e-mailed the defendant again on May 15, 2007, asking about the sale of the 1967 Healey. The defendant responded the same day and assured Cohen that the deal was "alive and well." Cohen replied and said that he was "glad to hear that [the] deal is alive. Just let me know when things are concluded."

On June 12, 2007, Cohen again e-mailed the defendant looking for information about the 1967 Healey. After detailing several improvements that he had made to the car, Cohen noted that he saw "a number of cars that are in inferior condition to mine going for prices that I would find acceptable at this point. . . . I certainly don't want the car back after all this time and have the hassle of selling it myself. It's just that at this point, after four years, I'd like to know what the prospects are for selling it under our present arrangement."

Cohen again e-mailed the defendant on July 26, 2007. The e-mail stated: "I just discovered from your website that you are moving. I have not heard from you since it sounded like you had a promising transaction involving my [1967] Healey a couple of months ago. . . . I am still hoping you can sell my car, but I'd like to know where it is at the moment and what your plans are."

In August, 2007, Cohen received a faxed handwritten letter from the defendant. It stated: "This written document will confirm my debt to you for sale of your 1967 . . . Healey for $25,000. As you recall [from] our conversations in January and February and subsequent emails outlining a trade for a 1960 . . . Healey that I consider a superior example and one special enough that I would take possession of and own personally and pay you directly. I am comfortable with having you hold ownership documents to both vehicles until you're paid in full. I'm also aware of your experience with your [1967] Healey was not a good one, so I'm willing to share the 1960 one with you so you can see how great one of these cars can be. This can be a win win for both of us."

The defendant claims that the state did not prove that he wrongfully withheld the 1967 Healey.[3] The defendant contends that e-mails between himself and Cohen talking about a "deal" constituted authorization for the cash and trade deal and that the prosecution failed to

---

[3] "Connecticut courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner." (Internal quotation marks omitted.) *State* v. *Flowers*, 69 Conn. App. 57, 69, 797 A.2d 1122, cert. denied, 260 Conn. 929, 798 A.2d 972 (2002). When the defendant committed the crimes in 2007, a person was guilty of larceny in the first degree when he committed "larceny, as defined in section 53a-119, and . . . (3) the property consists of a motor vehicle, the value of which exceeds ten thousand dollars . . . ." General Statutes (Rev. to 2007) § 53a-122.

establish that Cohen had revoked his authority prior to the trade of his 1967 Healey. Moreover, the defendant argues, although Cohen may have had understandings or impressions about the nature of their arrangement, there was no evidence that such impressions were communicated to the defendant. Thus, there was insufficient evidence to support a finding that he wrongfully withheld the 1967 Healey.

We begin by noting that "[t]he standards governing our review of a sufficiency of evidence claim are well established and rigorous. . . . [I]t is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Internal quotation marks omitted.) *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 656–57, 904 A.2d 149 (2006).

"While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [i]n evaluating evidence that could yield contrary inferences, the

[jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Youngs*, 97 Conn. App. 348, 353–54, 904 A.2d 1240, cert. denied, 280 Conn. 930, 909 A.2d 959 (2006).

In addition to the e-mail communications between Cohen and the defendant, Cohen testified that he reached a point where he was no longer comfortable waiting for the defendant to sell the 1967 Healey. Cohen also testified that he agreed to sell the vehicle for $25,000 after he discovered that the defendant had relocated and realized that he did not know where his car was located. In August, 2007, prior to receiving the faxed letter from the defendant, Cohen testified that he told the defendant by telephone that, if he did not receive money immediately, he would go to the authorities. Additionally, Cohen testified that he had no recollection of any conversation about a trade deal, that he never agreed to anything in the faxed letter and that the first time he heard about a trade was in the letter.

On the basis of the evidence presented at trial, the jury reasonably could have concluded that Cohen did not know that his 1967 Healey was being traded for the 1960 Healey and that he did not authorize the trade. The jury logically could have inferred that Cohen was aware of and authorized only the sale of his vehicle. It

did not have to accept the defendant's position that the e-mail communications about a trade deal constituted Cohen's knowledge about and authorization of the trade of his 1967 Healey. Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence was sufficient to support the jury's finding that by August, 2007, the defendant wrongfully withheld the 1967 Healey.

## III

The final claim raised by the defendant is that he is entitled to a new trial due to prosecutorial impropriety. The defendant argues that the prosecutor's reference to the word "victims" in his closing argument deprived the defendant of a fair trial. The state responds that the references to "victims" were not improper, and, even if the court should find that they were improper, there was no harm to the defendant. We conclude that the remarks were not improper.

Our standard of review is well settled. "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . [O]ur determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006). These factors include "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical

issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 540.

"[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process. . . . On the other hand . . . if the defendant raises a claim that the prosecutorial improprieties infringed a specifically enumerated constitutional right, such as the fifth amendment right to remain silent or the sixth amendment right to confront one's accusers, and the defendant meets his burden of establishing the constitutional violation, the burden is then on the state to prove that the impropriety was harmless beyond a reasonable doubt." (Citation omitted.) *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012).

"Our Supreme Court has stated that a court's repeated use of the word victim with reference to the complaining witness is inappropriate when the issue at trial is whether a crime has been committed. . . . A different set of circumstances exists when the person making the reference to the complaining witness is the prosecutor." (Citation omitted.) *State* v. *Rodriguez*, 107 Conn. App. 685, 701, 946 A.2d 294, cert. denied, 288 Conn. 904, 953 A.2d 650 (2008). Although the repeated use of the words "victim," "murder" and "murder weapon" throughout trial by the prosecutor is improper; *State* v. *Albino*, 130 Conn. App. 745, 762, 24 A.3d 602, cert. granted on other grounds, 302 Conn. 940, 941, 29 A.3d 466 (2011); isolated use of the term "victim" is neither improper nor prejudicial. *State* v. *Victor O.*, 301 Conn. 163, 191, 20 A.3d 669 (no impropriety where prosecutor used term victim in response to hearsay

objection made by defense counsel), cert. denied,
U.S.    , 132 S. Ct. 583, 181 L. Ed. 2d 429 (2011); see
also *State* v. *Warholic*, supra, 278 Conn. 369–70 (prosecutor's reference to "victim" twice during closing arguments not improper); *State* v. *Rodriguez*, supra, 107 Conn. App. 701–703 (prosecutor's use of term victim sporadically when questioning two of seven witnesses and at closing argument does not constitute prosecutorial impropriety).

In *State* v. *Warholic*, supra, 278 Conn. 369, the defendant argued that the prosecutor's two references to a victim during closing and rebuttal argument prematurely stigmatized the defendant of being guilty even though the case revolved around whether a crime had occurred. The court cautioned "the state . . . against making excessive use of the term victim to describe a complainant when the commission of a crime is at issue because prevalent use of the term may cause the jury to draw an improper inference that the defendant committed a crime against the complainant." (Internal quotation marks omitted.) Id., 370 n.7. Nevertheless, it concluded that reference to the term victim in that case was not improper because "the jury was likely to understand that the state's identification of the complainant as the victim reflected the state's contention that, based on the state's evidence, the complainant was the victim of the alleged crimes." Id., 370.

Similarly, in *State* v. *Rodriguez*, supra, 107 Conn. App. 700–701, the defendant argued that the prosecutor's use of the word victim during direct examination and during closing argument constituted prosecutorial impropriety. In concluding that the prosecutor's use of the word victim was not improper, this court noted that "[b]efore the prosecutor got into the heart of his argument, he stated to the jury that what he was about to say was argument, not evidence . . . [and] that argument is how counsel interprets the evidence." Id., 702. This

court also noted that the court "instructed the jury that the arguments of counsel reflected their view of the evidence." Id., 702 n.11. This court further explained that "[j]urors understand the respective roles of the prosecutor and defense counsel. It should not be assumed that jurors will be unduly influenced by the prosecutor's use of the word victim." Id., 703.

The present case is factually similar to *Warholic* and *Rodriguez*. In this case, the prosecutor used the word victims three times at the end of his closing argument. At the beginning of his closing argument, however, he told the jury that his statements were argument, not under oath or testimony, and that they consisted of points that he wanted them to consider. Moreover, in its jury instructions, the court told the jurors that counsels' closing arguments were not testimony, but merely statements that help the jury interpret the evidence. We will not assume that the jurors were unduly influenced by the prosecutor's isolated use of the word victims. Accordingly, we conclude that the prosecutor's references to "victims" were not improper.

The judgments are affirmed.

In this opinion the other judges concurred.